Guy Anthony BOONE *v.* STATE of Arkansas

CR 98-284                                          976 S.W.2d 921

Supreme Court of Arkansas
Opinion delivered October 7, 1998

*David W. Talley, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant Guy Anthony Boone was found guilty of first-degree murder and sentenced to life imprisonment. Mr. Boone's sole challenge on appeal is that the trial court erred when it denied his motion to suppress an inculpatory custodial statement. We find no merit in Mr. Boone's challenge to the voluntariness of his custodial statement and, thus, affirm the trial court's denial of his motion to suppress.

Mr. Boone was arrested and taken into custody in connection with the murder of Ella Mae Robinson on January 5, 1997, at approximately 1:08 p.m. At 3:27 p.m. that same day, Detective Randall Rhodes read the *Miranda* rights form to Mr. Boone and Mr. Boone signed the waiver of rights form in the presence of Detective Rhodes and Detective Jamie Morrow. Detective Rhodes then began to interview Mr. Boone about the murder of Ms. Robinson. Mr. Boone denied any involvement with the murder and further stated that he would not murder anyone because his own mother had been murdered. Detective Morrow left the room and contacted Captain Carolyn Dykes to give her a status report on the investigation. Captain Dykes then entered the room to talk with Mr. Boone. He continued to deny any involvement with the murder and told Captain Dykes that they were attempting to frame him by telling him that there was blood on his clothing. She responded to his concern by referring to their past

dealings when he had been truthful and she had been fair. She told Mr. Boone that he would feel better if he were truthful about the homicide. Captain Dykes then left the room and Detective Rhodes initiated Mr. Boone's first taped statement, which began at 4:35 p.m. and concluded at 4:52 p.m.

In his first taped statement, Mr. Boone admitted going to Ms. Robinson's home early that morning but denied killing her. At the conclusion of Mr. Boone's first taped statement, Detective Rhodes left the room and Detective Morrow returned to the room. Detective Morrow then proceeded to tell Mr. Boone that he had verified Mr. Boone's claim that his mother had been murdered and that "the man who done it, you know, was man enough to admit that he'd done wrong." Mr. Boone began to cry and asked to speak to Captain Dykes again. Captain Dykes returned to the room and spoke with Mr. Boone before she instructed the detectives to take a second statement.

Although a new *Miranda* rights form was not filled out for the second statement, Detective Morrow turned on the tape recorder and read Mr. Boone his rights again. Mr. Boone waived his rights and gave the second taped statement in which he admitted stealing two gold chains and shooting Ms. Robinson three times in the face, with the last two shots being at close range. The second taped statement began at 5:29 p.m. and concluded at 5:53 p.m.

At the suppression hearing, all of the officers involved in the interviews with Mr. Boone testified that he was responsive and coherent and that he did not appear to be under the influence of drugs. The officers also testified that no promises regarding charges, penalties or leniency were ever made and that Mr. Boone was not coerced in any way to make the statements. Finally, the officers denied disclosing any information about the crime scene to Mr. Boone before he told them certain details about the crime, such as how many shots were fired, the distance from which they were fired, the location of Mrs. Robinson's body, and the location and number of wounds she sustained. The trial court ruled that Mr. Boone's custodial statement was admissible because it was

freely and voluntarily given, without any threats, physical abuse, or promises of any kind.

On appeal, Mr. Boone contends that his second custodial statement was involuntary. Specifically, he claims that Detective Morrow's comment that the murderer of Mr. Boone's mother was "man enough" to admit to his wrongdoing amounted to emotional coercion, thereby rendering his second custodial statement involuntary and inadmissible.

Statements made while in custody are presumed involuntary, and the burden is on the State to show that the statements were made voluntarily and freely, without hope of reward or fear of punishment. *Stephens v. State*, 328 Ark. 81, 941 S.W.2d 411 (1997). The issue on appeal is whether Mr. Boone's second custodial statement was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). In making this determination, we review the totality of the circumstances and reverse the trial court only if its decision was clearly erroneous. *Davis v. State*, 330 Ark. 76, 953 S.W.2d 559 (1997); *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997). In this regard, the relevant factors are the age, education, and intelligence of the accused; the lack of advice of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of mental or physical punishment. *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998); *Davis, supra; Wofford, supra; Humphrey, supra.*

The use of psychological tactics by police officers is an acceptable means of interrogation. *Noble v. State*, 319 Ark. 407, 892 S.W.2d 477 (1995). Specifically, police officers may attempt to play on an accused's sympathies or explain to him that honesty is the best policy, provided that the accused's decision to make a custodial statement is voluntary in the sense that it is a product of the accused's own free will. *Noble, supra.* Mr. Boone claims that Detective Morrow's remark about the murderer of Mr. Boone's mother being "man enough" to confess amounted to emotional coercion, *i.e.*, that it compelled him to confess to the murder. Mr. Boone did indeed begin to cry after Detective Morrow's remark.

Captain Dykes testified that when she returned to talk to Mr. Boone, his mood had changed. He was crying and remorseful and apologized for having lied earlier. Mr. Boone's change in demeanor after Detective Morrow's remark is only one factor in our review of the totality of the circumstances.

With regard to the remaining relevant factors, Mr. Boone makes no claim that he was vulnerable due to his age, education, or intelligence. Nor does he claim that the confession was given after a lengthy detention or after prolonged or repeated questioning. The entire interview process lasted less than three hours, and Detective Morrow made only one remark about the murder of Mr. Boone's mother. Mr. Boone was also advised of his constitutional rights on two separate occasions before he elected to waive those rights. Mr. Boone does not claim and the evidence does not show that the officers made any promises or that they punished him physically. Nor does Mr. Boone claim that he was under the influence of drugs allegedly ingested approximately thirty minutes before his arrest. The interrogation began more than two hours after his arrest, and Mr. Boone was lucid, responsive, and alert, according to the undisputed testimony of the officers. Finally, Mr. Boone was no stranger to the criminal justice system, having had several previous convictions.

Based on the totality of the circumstances surrounding Mr. Boone's confession, we cannot say that the trial court's conclusion that the statement was voluntary was clearly erroneous. Accordingly, we affirm the trial court's denial of Mr. Boone's motion to suppress.

The record has been reviewed for prejudicial error pursuant to Ark. Sup. Ct. R. 4–3(h), and no reversible errors were found.

Affirmed.